## STATE v. CHARLOTTE MAZIE CARTER.

### (Filed 19 April, 1961.)

**1. Homicide § 10—**

A person has the right to kill not only in his own self-defense but also in the defense of another who stands in a family relationship to him.

**2. Homicide § 13—**

While the intentional killing of another with a deadly weapon raises the presumptions that the killing was unlawful and that it was done with malice, the presumption that the killing was unlawful does not shift the burden of proof and cannot obtain when the State's evidence tends to show that defendant killed deceased in the lawful defense of her mother, and the State's evidence tending to establish such defense is not contradicted by other evidence.

**3. Criminal Law § 85—**

When the State introduces in evidence exculpatory statements of defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound thereby.

**4. Criminal Law § 101—**

When the State introduces in evidence exculpatory statements constituting a complete defense, and such statements are not contradicted by any other evidence, defendant may avail himself thereof on motion for judgment as of nonsuit.

**5. Homicide § 20—**

Where the State introduces testimony of statements tending to show that defendant killed her father in the lawful defense of her mother, and there is no evidence from which the jury could reasonably find that either defendant or her mother was at fault in starting the affray, and there is no evidence in the record tending to contradict or impeach the statements offered by the State, nonsuit should be granted.

APPEAL by defendant from *Johnston, J.,* at October 3, 1960 Term of ALLEGHANY.

Criminal prosecution upon a true bill of indictment returned by the Grand Jury at the August 29, 1960 Term of Alleghany County, North Carolina, charging: "That Charlotte Mazie Carter, late of Alleghany County, on the 9th day of July, 1960, with force and arms at and in the aforesaid county feloniously, willfully, and of her malice aforethought, did kill and murder Elijah Carter, contrary to the form and statute in such case made and provided, and against the peace and dignity of the State."

The solicitor announced that the State would not ask for a verdict of murder in the first degree, but would ask for a verdict of murder in the second degree or manslaughter as the evidence may warrant.

Plea: Not guilty to the charge of second degree murder.

Upon trial in Superior Court the defendant is referred to as "Charlotte"; her father as "Elijah", sometimes "Lije"; and her mother as "Treva".

The case came on for trial at the October 3, 1960 Term of Superior Court, before judge and jury. The State offered as a witness Floyd O. Roupe, Sheriff of Alleghany County, who testified in pertinent part as follows:

" * * * On July 7th I went to the home of Elijah Carter after Charlotte Carter came to my house about 9 P.M. She knocked on the door and * * * said, 'I think I have killed my daddy.' I asked her what happened and she replied that they had gotten into a fight over at her house and she had hit him and they had taken him to the hospital. I went to the hospital with Charlotte and her mother, and Elijah was in the emergency room being sewed up. Later Charlotte related to me that about 7:30 P.M., her father, Elijah, came home from work and there was part of a screen door which had fallen off and he thought someone had torn it off and that he jumped on her 9 and ½-year-old brother Michael about it * * * That her mother told Elijah that the boy had not torn up the door, — that the piece came off when she * * * went out the door. Charlotte said her mother was in bed sick that day, and that her mother got up and went

into the kitchen and her mother and father started arguing — that they then started scuffling and that her father, Elijah, grabbed her mother, Treva, around the waist and was beating her with his fist and they scuffled around until they got in the living room. That there was a wine bottle nearby and that Elijah grabbed it and started to hit Treva, and that she, Charlotte, took it out of his hand and that Elijah and Treva fell in the floor, and that she, Charlotte, started to help her mother get up, and Elijah grabbed her, Charlotte's, arm and started twisting it and that her mother tried to talk him into stopping, but could not, and that her mother started hitting him in the back of the neck and head with her fists and that Elijah turned her loose and she told her mother she was leaving and went out into the yard. * * * Charlotte said she went around to get in the car which was sitting in front of the house. That her mother was in the yard also, and her father came out with a bottle in his hand and he hit her mother over the head with the bottle and he had the neck of the bottle in his hand. Charlotte said there was a bumper jack leaning up against the porch in front of the car. She said she saw her father start toward the bumper jack and that she jumped out of the car and ran around and both of them grabbed the jack about the same time, and that she twisted it out of his hand and began hitting him over the head with it. She said she hit him two or three times and knocked him to his knees, and then she ran around and got back in the car again. She said she looked back and saw Elijah going toward Treva again, and that she jumped out of the car and hit him in the head several times with the bumper jack, from behind, — she said she didn't remember how many but several times, and kept hitting him until he went down on the ground. That she got her mother in the car and brought her to the hospital. That she left her father lying on the ground and her brother went to get help * * * That (using a diagram sketched on blackboard) from what Charlotte said (to illustrate testimony) she and her mother were out in the yard, that she got in the car and told her mother to come on and get in, that she, Charlotte, got in on the driver's side, that Elijah came out of the house with the bottle in his hand and that Treva was trying to get in the car, and Elijah hit Treva over the head with the bottle and it broke, leaving only the neck of the bottle in his hand; and Lije started toward the jack with the neck of the bottle in one hand and grabbed the jack with the other, and she twisted it out of his hand and hit him over the head several times, and knocked him to his knees in this area in front of the house (indicating), and got back in the car and saw him going toward her mother, who was in this area in front

of the house (indicating) 15 or 20 feet from the house and about 20 feet from where Charlotte was in the car, and she grabbed up the jack and started hitting him over the head from behind * * * this was the second time, and that this happened in front of the house (indicating). She said she hit him two or three times — she was not sure how many the first time and she didn't remember the second time, but kept hitting him until he fell to the ground. She said he did not fall the first time — that he went to his knees."

And the Sheriff continuing said: "I knew Elijah Carter and he was six feet two inches, and weighed about 175 pounds, muscular and very strong. When I saw Elijah at the hospital he was not able to talk, and when I saw him on July 9th, he was dead."

Under cross-examination the testimony of the Sherriff did not materially vary from the story as detailed by the direct examination.

Also the State offered as witness Dr. G. J. Ashley who testified, among other things not pertinent to this appeal, that he examined Elijah and that in his opinion he died from a fractured skull and from inter-cranial hemorrhage, or bleeding inside the head, as a result of the injuries observed on his body.

The defendant and her mother testified substantially to the same facts as related by Sheriff Roupe.

And when the State rested its case, and again at the close of all the evidence, the defendant moved for judgment as of nonsuit. The motions were denied and defendant excepted.

The case was submitted to the jury upon the evidence so offered.

Verdict: Guilty of manslaughter.

Judgment: Confinement in the Woman's Division of State's Prison for a term of not less than two nor more than five years.

Defendant objects and excepts thereto and appeals to the Supreme Court, and assigns error.

*Attorney General Bruton, Assistant Attorney General, Harry W. McGalliard for the State.*

*Worth B. Folger for defendant appellant.*

WINBORNE, C.J. Under the law of self-defense a person may not only take life in his own defense, but he may also do so in defense of another who stands in a family relation to him. *S. v. Greer,* 162 N.C. 640, 78 S.E. 310; *S. v. Anderson,* 222 N.C. 148, 22 S.E. 2d 271; *S. v. Church,* 229 N.C. 718, 51 S.E. 2d 345; *S. v. Rawley,* 237 N.C. 233, 74 S.E. 2d 620.

While, ordinarily, as contended by the State, the intentional killing

of another with a deadly weapon raises two presumptions against the defendant, first, that the killing was unlawful, and second, that it was done with malice. *S. v. Mangum,* 245 N.C. 323, 96 S.E. 2d 39. However this rule of law does not mean that the burden of showing an unlawful killing does not still rest with the State. *S. v. Howell,* 218 N.C. 280, 10 S.E. 2d 815.

When the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements. *S. v. Todd,* 222 N.C. 346, 23 S.E. 2d 47; *S. v. Boyd,* 223 N.C. 79, 25 S.E. 2d 456; *S. v. Watts,* 224 N.C. 771, 32 S.E. 2d 348; *S. v. Ray,* 229 N.C. 40, 47 S.E. 2d 494.

And when the State's evidence and that of the defendant is to the same effect, and tend only to exculpate the defendant, his motion for judgment as of nonsuit should be allowed. *S. v. Fulcher,* 184 N.C. 663, 113 S.E. 769.

As stated by *Stacy, J.,* later *C. J.,* in the last cited case, "Where a complete defense is established by the State's evidence, a defendant should be allowed to avail himself of such defense on a motion for judgment as of nonsuit."

In the case in hand the State introduced statements of the accused to the effect that the defendant was trying to stop the deceased from assaulting her mother with a broken bottle. Furthermore, there is no evidence from which a jury could reasonably find that either the defendant or her mother was at fault in starting the altercation described in the record.

This evidence plainly negatives the existence of an unlawful killing. The exculpatory statements of the defendant are not contradicted or shown to be false by any other fact or circumstance in evidence. While the State by offering this evidence was not precluded from showing that the facts were different, no such evidence was offered, and the State's case was made to rest entirely on the statements of the defendant, which the State presented as worthy of belief. *S. v. Todd, supra.* And it is patent that all she did was done in defense of her mother.

In the *Todd* case, *supra, Devin, J.,* later *C. J.,* said: "Here we think the defendant's statement fails to afford substantial evidence of his guilt of the offense charged * * * and rather tends to exculpate him, and hence his motion for judgment of nonsuit should have been sustained."

Consequently, we are constrained to hold upon the record of case on appeal in this case that these exculpatory statements are

binding upon the State, and that the motion of the defendant for judgment of nonsuit at the close of all the evidence ought to have been sustained in the court below. Put another way, when the entire evidence shows, and no other reasonable inference can be fairly drawn therefrom, that the killing was committed in defense of her mother, the trial judge should have granted the motion of nonsuit.

For reasons stated, the judgment entered in the trial court is reversed, and the defendant's motion for judgment of nonsuit is sustained in this Court pursuant to G.S. 15-173.

Reversed.