STATE OF NORTH CAROLINA v. RUDY CLEGG BRUTON AND WILLIE JUNIOR SMITH.

(Filed 2 June, 1965.)

**1. Criminal Law §§ 99, 104—**

Upon a motion for judgment as of nonsuit or for a directed verdict at the close of the State's evidence, and renewed by the defendant after the intro-

duction of his own evidence, all the evidence upon the whole record tending to sustain a conviction will be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.

**2. Criminal Law § 101—**

Nonsuit is properly denied if there is substantial evidence of defendant's guilt of every essential element of the offense charged, and it is immaterial whether such evidence is direct or circumstantial, or both.

**3. Criminal Law § 85—**

Where officers take the defendant to the cell of a confederate for the purpose of having defendant repeat certain incriminating statements in the presence of the confederate, and the officers permit defendant to interrogate the confederate, eliciting exculpatory statements, whereupon the officers stop the questioning, defendant is justified in declining to make any further statements in the presence of the confederate, and the State is bound by the exculpatory statements in the absence of evidence of other facts or circumstances tending to show them to be false.

**4. Criminal Law § 9—**

In order for a person who is present at the scene of the crime to be guilty as an aider and abetter there must be some evidence tending to show that such person, by word or deed, gave active encouragement to the perpetrator, or by his conduct made it known to the perpetrator that he was standing by to render assistance when and if it should be necessary.

**5. Criminal Law § 99—**

On motion to nonsuit, the court will consider not only defendant's evidence which explains or makes clear that offered by the State but also defendant's evidence which rebuts the inference of guilt when it is not inconsistent with the State's evidence.

**6. Homicide § 20— Evidence which fails to show defendant was present at scene until after commission of homicide held insufficient to be submitted to jury.**

The State's evidence tended to show that an officer stopped a Chevrolet automobile with four Negro occupants and parked his patrol car back of it, that one of the Negroes ran into the adjacent cornfield, pursued by the officer, who fired shots over his head, whereupon two of the Negroes drove off in the automobile, and that the officer was later found lying in the cornfield with a fractured skull and with four pistol wounds in his head, with expert testimony that the wounds were inflicted while the officer was lying unconscious, and that the blow to the head would render him unconscious. The State further introduced evidence that the patrol car was later driven into the woods and that the shoe print of defendant was found in the cornfield near the body of the officer, but the State introduced testimony of witnesses who passed the scene who testified that they saw defendant or a "light skinned man" talking to the patrolman beside the Chevrolet and later standing beside the patrol car, but none testified that they saw the patrol car parked on the highway with no person near it. The State further introduced testimony of statements of defendant that at the time the shots were fired he was standing beside the patrol car, that his companion came out of the cornfield with a pistol and drove the patrol car

STATE *v.* BRUTON.

into the woods, and that defendant thereafter went into the cornfield where the officer was lying and then turned and walked away. *Held:* Taking all the evidence as true, it does not place defendant in the cornfield until sometime after the fatal shots were fired, and therefore the evidence is insufficient to be submitted to the jury on the issue of defendant's guilt.

PARKER, J., dissents.

APPEAL by defendant Bruton from *Fountain, J.,* 7 December 1964 Special Criminal Session of HOKE.

Criminal prosecution tried upon indictment charging the defendants with the first degree murder of Highway Patrolman William T. Herbin.

The evidence disclosed by the record is that Rudy Clegg Bruton (Bruton), Albert Reaves (Reaves), Willie Allen (Allen), and Willie Junior Smith (Smith) left Pinehurst Monday afternoon, 31 August 1964, riding in a 1957 black Chevrolet sedan which belonged to Allen. The defendant Bruton had made arrangements with Allen to take him to Fayetteville where Bruton wanted to do some shopping for himself and his children.

At first, defendant Bruton was driving the car and stopped at a filling station where he purchased two dollars worth of gas and three cans of beer. Bruton testified: "I did not drink a whole can; we divided the three cans among the four of us." When the four left the gas station, the defendant Smith was driving; Allen, the owner of the car, sat in the front seat with Smith; Reaves and Bruton were sitting in the rear seat.

The State's evidence tends to show that while traveling on Highway 401, about 8½ miles north of Raeford, North Carolina, Smith saw a Highway Patrolman coming behind him and he pulled over and stopped. Patrolman William T. Herbin drove his patrol car onto the shoulder of the road and parked it behind the Allen car. The Patrolman got out of his patrol car and went to the driver's side of the Chevrolet and asked Smith for his driver's license and registration card. Smith did not have a license but gave the Patrolman an envelope, and Allen began looking in the glove compartment for his registration card. Before the registration card was found, all of the occupants of the Chevrolet, except Allen, had gotten out of the car and the Patrolman indicated he was going to arrest all of them, except Bruton, for public drunkenness.

Reaves testified that before the Patrolman got the contents out of the envelope which Smith had handed him, "Smith ran to the cornfield and the Patrolman was in behind him, hollering 'Halt' and he shot straight up in the air, and I didn't see no more than that. I didn't see Bruton any more * * *. I stepped right back and got in the left-hand side of the car and took off. I told Willie (Allen) they would arrest us. * * *

I just went on the road to where I 'seed' the road·turn off, to get out of the way of the Patrolman in case he caught Smith and came back he wouldn't see us." On cross examination, this witness testified: "* * * The only person the Patrolman didn't arrest was Rudy Clegg Bruton; he wasn't drunk. * * * When Willie (Smith) ran to the cornfield and the officer went running after him, shooting over his head, I said to Will (Allen), 'I am gone from here,' and I got right in the car and took off. * * *"

Allen testified: "* * * The Patrolman was talking to Willie Junior Smith at the time. (The Patrolman and Smith at that time were standing near the right side of Allen's car and Allen was sitting on the right side of the front seat.) Rudy Clegg Bruton was in the car, too. He got out and Reaves got out. Well, there was talking there; I don't know what they was talking about out there, but I know all at once, Willie (Smith) taken off; Bruton, he taken off and the Patrolman. Willie took off first into the cornfield; Rudy Clegg Bruton went right behind Willie Junior. The Patrolman, he was running on out there and he just pulled his pistol and shot it and said, 'Halt.' * * * Well, Albert (Reaves) got under the wheel and I said, 'Well, let's go.' I * * * left with Reaves." On cross examination, this witness testified: "The truth about it is, I was drunk * * *. I don't know whether the Patrolman had placed both Reaves and me under arrest for being publicly drunk; I didn't hear nothing about it."

Immediately after Smith ran, Reaves and Allen left the scene in Allen's car with Reaves driving. Reaves drove north on Highway 401 for a quarter of a mile, turned left on a dirt road, and had driven several miles when they had a blowout. Allen was too drunk to walk and stayed in the car, went to sleep and was found asleep in the car sometime during the night by a Patrolman. Reaves walked back to his home near Pinehurst, arriving there about 11:30 P.M.

J. R. McPherson, a witness for the State, testified that between 3:30 and 4:00 P.M. on 31 August 1964 he had occasion to be on Highway 401; that he passed a 1957 black Chevrolet on a dirt road on which he was riding just before he entered the highway. The car was occupied by two men. That he turned into the highway and drove south by the patrol car and saw a "bright skinned man," whom he identified as Bruton, standing in front of the patrol car. That around 5:00 o'clock when he returned he saw Smith walking (south) on the west side of Highway 401, not quite a mile from the cornfield, going toward Raeford. The 1957 Chevrolet was nowhere in the area; the patrol car was parked in the woods on the same side of the road where it was originally parked.

Roy Brock, another witness for the State, testified that between 3:30 and 4:00 P.M. on the day in question he was working near this cornfield, which contained approximately two acres in a triangular shape; that he heard four shots in rapid succession; that he did not recall hearing any other shots.

William Wooten testified: "* * * I was on Highway 401 in the vicinity of the Hoke County line on the afternoon of the 31st of August 1964, headed from Raeford into Fayetteville, something between 3:30 and 4:00 o'clock. Paul Butler, who I work with, was the driver and I was sitting on the right-hand side of the car. Before arriving at this area I saw a patrol car located on the right-hand shoulder of the road, headed toward Fayetteville; there was a fifty-seven black Chevrolet in front of it. I saw one man on the right-hand side of the patrol car, with his hand on it. I saw two men in the black Chevrolet, in the front seat. I did not see the Patrolman there. The man I saw with his hand on the patrol car was a light skinned man, heavy set, and that is all I know. The two men in the black Chevrolet were colored men is all I could tell." On cross examination, this witness further testified: "I saw a light skinned man standing on the road beside the patrol car and two men in the other car; I did not see the Patrolman and didn't see another man. I could not say Bruton is the man I saw; it was a light skinned man like that. At the time I saw him I did not see the defendant Smith but saw the two other men sitting in the car."

Several other State's witnesses testified that they passed by this cornfield on this particular afternoon and saw a "bright skinned man" standing by the patrol car. Some of these witnesses identified the man as the defendant Bruton. Mrs. Wyatt Upchurch testified that she was on Highway 401 on this particular afternoon; that "* * * I saw a patrol car in the area of Mrs. Thompson's house middleway of the cornfield parked beside the road, on the same side of the road that I was traveling, in the direction of Fayetteville. There was a dark skinned man coming out of the cornfield and the light skinned man was standing back of the patrol car. I did not see anyone else in the area at the time, nor any vehicles nor a Highway Patrolman. After the dark skinned man came out of the cornfield he went around to the driver's side and a door opened * * * I don't know whether he got in or not. You could tell the dark skinned man was in a hurry as he came out of the cornfield. I saw nothing else as I passed."

Bruton made certain statements, according to the State's evidence, tending to show that he had been near the body of the deceased in the cornfield. According to Sheriff David Barrington's testimony, Bruton stated to him in the presence of Patrolman R. F. Williamson, that "if he (Bruton) did hit him, he didn't hit him with his gun." Bruton fur-

ther stated to Patrolman Williamson that "he had heard the shots fired in the field, that he was beside the patrol car at that time, out at the highway, and that he had heard several shots, and that Willie Smith came out of the cornfield and as he approached the patrol car that he saw a shining pistol in Willie Smith's pocket." Patrolman Williamson further testified that Bruton told him that "he (Bruton) looked at the pistol and says, 'Is that the Patrolman's gun?' And Willie Smith said it was. * * * (H)e (Bruton) said he took the pistol and held it in his left hand for two or three seconds. He stated then that he gave the pistol back to Willie Smith, and Willie Smith put the pistol in his pocket, got in the patrol car and moved the patrol car down in the woods. He (Bruton) stated as Willie Smith drove the patrol car down into the woods, that he (Bruton) went into the cornfield, up to the area where Herbin was lying, looked at Herbin, and turned around and walked out to the north end of the cornfield, and went over to Mrs. Thompson's house and asked for a ride into Fayetteville. He stated to me that Mrs. Thompson told him that her husband was sick and she did not drive. He then stated that he saw Willie and they broke up and he went into Fayetteville * * *."

It appears from the record that after Bruton made a statement to Sheriff Barrington and Patrolman Williamson, they asked Bruton if he would go down to the next cell and make the same statement in the presence of Smith, and he said he would. When Bruton, the Sheriff and Williamson arrived at Smith's cell, Patrolman Williamson testified, "* * * I told Rudy Clegg Bruton to go ahead and make the statement, and then he said, 'May I ask some questions?' or 'May I ask a question?' and I replied to him that he could. And then he asked Willie Smith, 'Willie, did you see me go in the cornfield?' or 'You didn't see me go in the cornfield,' or words to that effect and Willie said, 'No.' And he said, 'Willie, did I have anything to do with this situation?' or this murder or trouble that I am in. And then I said, 'Rudy, just a moment. I brought you down here to tell the same thing that you told up there in the cell, not to cross examine or to question Willie; you go ahead and tell him what you told Sheriff Barrington and I.'" These officers were then unable to get Bruton to make the statement they wanted him to make in the presence of Smith.

The body of Patrolman Herbin was discovered about 9:30 P.M. on the night of 31 August 1964; it was lying near the edge of the cornfield which the Patrolman had entered in his pursuit of Smith, a distance of 110 feet from where he had parked his patrol car on Highway 401. According to the State's evidence, "* * * The corn was so thick you could not see very well from one or two rows. You can stand in one

row and it would be hard to see anything two rows away. The corn was in excess of six feet."

A footprint, similar to the print of the shoe worn by Bruton, was found in the cornfield near the body of the deceased. Haywood Starling, a Special Agent of the North Carolina Bureau of Investigation, testified as follows: "* * * (T)he similarities which I found in these two exhibits include a similarity of length and also in addition include a similarity of contour of sole. I found also similarity in wear of the heel, included in the shoe which I hold, and similarities of wear included in the cast which I also hold. * * *

"From my comparison of these two exhibits, I have an opinion satisfactory to myself as to whether or not the impression made by that mold and the left shoe of Exhibit Number 11 (shoe of the defendant Bruton) are the same. It is my opinion that the impression represented by the cast in State Exhibit 15 could have been an impression of the left shoe included in State Exhibit 11, and further that it not only could have been, but was impressed by the shoe in State Exhibit 11, or another shoe of the same similarities which I have testified to." This witness was not present when the cast referred to was made.

The State's evidence further tends to establish that Bruton had a residue of chemicals on the back side of his left hand which could have been left by the firing of a pistol. Tests of the palms and webs of Bruton's hands were negative with regard to the metals normally found on the hands of a person who has recently fired a pistol.

Dr. W. S. Gilmer testified in substance that he examined the body of Patrolman Herbin on 3 September 1964 and discovered five injuries, four of which were penetrating wounds and a fifth a crushing fracture of the skull. The fracture was located over the left frontal bone, extending from the left eyebrow upward a distance of two inches, and was about two and a half inches wide. "That is what we call a depressed fracture." Of the four penetrating wounds, three were located on the face and one behind the right ear. Of those on the face, one was located just to the right of the nose, about three-quarters of an inch below the eyelid. This wound entered at this point, fracturing the bone. The second wound was located about an inch below the right cheekbone, and about two and a half inches from the midline of the upper lip. The third wound on the face was lower in the right jawbone.

The three bullets which passed through the head of Patrolman Herbin were found imbedded in the ground where they had penetrated to a depth of approximately six inches. Dr. Gilmer further testified that in his opinion the wounds were inflicted by bullets passing through the head from a gun discharged after Patrolman Herbin was unconscious

and immobile. All three wounds were exactly parallel, one to the other. "In my opinion the three wounds I have described were the cause of death." The bullet that entered behind the right ear was removed several days later.

Dr. Duncan S. Owen testified: "* * * I * * * have an opinion from my examination that the fracture of the left forehead would have caused death; I have an opinion that the fracture would have rendered him unconscious, immediately unconscious."

At the close of the State's evidence, the defendant Bruton moved for a directed verdict of not guilty. The motion was denied.

The defendant's evidence tends to show that Bruton is a man of good character; that he had never been charged with any infraction of the law prior to his indictment in this case; that he graduated from Peabody High School in Troy, North Carolina, in 1961, and attended Winston-Salem State College for one year; that in August 1964 he was employed as a bartender at Whispering Pines and had previously held a similar position at the Pinehurst Country Club; that some of his duties included making the bank deposits for the club and getting the mail from the postoffice; that on 31 August 1964 it had rained over the week end and the ground was too wet to play golf and his boss told him he could close up the bar and have the day off after he made the bank deposit and got the mail. That afternoon, Bruton made an agreement with Allen to take him to Fayetteville. He had never seen Reaves prior to that day, and while he knew Smith and Allen he had never associated with either of them until he started on this trip to Fayetteville.

Bruton testified that the Patrolman asked him if he had a driver's license and that he told him he did, and that he showed him his driver's license; that the Patrolman asked him to drive the car and follow him to Raeford. He (the Patrolman) then put Allen and Reaves under arrest, told Smith to ride with him, and Reaves and Allen to ride with him (Bruton). Reaves and Allen were in the front seat and he (Bruton) was under the steering wheel. "* * * (T)he Patrolman saw Willie take off for the field and the Patrolman took off behind him and he taken the pistol and fired it into the air right behind him. The Patrolman was running after Willie through the field, shooting over his head. He shot up in the air once before he entered the cornfield. Reaves and Will (Allen) tried to get me to drive on and I wouldn't drive off because the Patrolman had put us under arrest. * * * I then got my raincoat out of the car and walked to the Patrolman's car and stayed right there at the patrol car. Will and Reaves drove off * * *."

Defendant Bruton further testified that he heard shots while he was standing by the parked patrol car on the highway a short time before defendant Smith came back out of the cornfield; that he asked Smith

why he ran from the Patrolman and that Smith said "he had been in prison for three years for driving without an operator's license." Defendant Bruton also testified that Smith told him that he and the Patrolman had "wrestled over the gun and it started going off and one of the bullets grazed his (the Patrolman's) arm or shoulder, like, and that was all." That he and Smith started walking toward Fayetteville when Smith decided to go home and they parted. Bruton continued to Fayetteville to do his shopping; he then returned home by bus where he was arrested later that night.

With respect to the chemicals found on the back of his left hand, Bruton testified that sometime during the night of 31 August 1964, he was arrested and put in the back seat of the officer's car with the defendant Smith and that his left hand was handcuffed to Smith's right hand and they were carred to jail in Raeford.

At the close of all the evidence, the defendant Bruton renewed his motion for a directed verdict of not guilty. The motion was again denied. From a verdict of guilty of murder in the first degree with the recommendation that his punishment be imprisonment in the State's Prison for life, and from the judgment entered pursuant thereto, the defendant Bruton appeals, assigning error.

*Attorney General Bruton, Deputy Attorney General Harry W. Mc-Galliard for the State.*

*H. F. Seawell, Jr., for defendant Bruton.*

DENNY, C.J. The defendant's only exceptions and assignments of error are (1) to the failure of the court below to direct a verdict of not guilty at the close of the State's evidence; (2) in denying the renewal of the motion of the defendant for a directed verdict of not guilty; and (3) to the failure of the court below to set aside the verdict.

Upon a motion for judgment as of nonsuit or for a directed verdict at the close of the State's evidence, and renewed by the defendant after the introduction of his own evidence, all the evidence upon the whole record tending to sustain a conviction will be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *S. v. Kelly,* 243 N.C. 177, 90 S.E. 2d 241; *S. v. Kluckhohn,* 243 N.C. 306, 90 S.E. 2d 768; *S. v. Smith,* 237 N.C. 1, 74 S.E. 2d 291; *S. v. McKinnon,* 223 N.C. 160, 25 S.E. 2d 606.

The State concedes in its brief that the sole question presented on this appeal is whether or not there was enough evidence to go to the jury on the question of the defendant's guilt of murder in the first degree.

The State cites and quotes from *S. v. Redfern*, 246 N.C. 293, 98 S.E. 2d 322, as follows: "Where two persons aid or abet each other in the commission of a crime, both being present (either actually or constructively), both are principals and are equally guilty. *S. v. Holland*, 234 N.C. 354, 67 S.E. 2d 272; *S. v. Jarrell*, 141 N.C. 722, 53 S.E. 127.

" 'A person aids or abets in the commission of a crime within the meaning of this rule when he shares in the criminal intent of the actual perpetrator *(S. v. Oxendine*, 187 N.C. 658, 122 S.E. 568), and renders assistance or encouragement to him in the perpetration of the crime.' *S. v. Birchfield*, 235 N.C. 410, 70 S.E. 2d 5."

This Court, speaking through Higgins, J., in *S. v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431, said: "We are advertent to the intimation in some of the decisions involving circumstantial evidence that to withstand a motion for nonsuit the circumstances must be inconsistent with innocence and must exclude every reasonable hypothesis except that of guilt. We think the correct rule is given in *S. v. Simmons*, 240 N.C. 780, 83 S.E. 2d 904, quoting from *S. v. Johnson*, 199 N.C. 429, 154 S.E. 730: 'If there be any evidence tending to prove the fact in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury.' The above is another way of saying there must be substantial evidence of all material elements of the offense to withstand the motion to dismiss. It is immaterial whether the substantial evidence is circumstantial or direct, or both. * * *." The foregoing rule has been followed in *S. v. Horner*, 248 N.C. 342, 103 S.E. 2d 694; *S. v. Haddock*, 254 N.C. 162, 118 S.E. 2d 411; *S. v. Casper*, 256 N.C. 99, 122 S.E. 2d 805; *S. v. Thompson*, 256 N.C. 593, 124 S.E. 2d 728; and *S. v. Moore*, 262 N.C. 431, 137 S.E. 2d 812.

In analyzing the State's evidence, we find that notwithstanding Allen's statement to the effect that Bruton ran into the cornfield with Smith, the State's witness Wooten testified that he passed along Highway 401 on the afternoon in question and saw two colored men in the 1957 black Chevrolet and that he saw one man on the right-hand side of the patrol car; that he did not see a Patrolman there and did not see any other man. In describing the man who was standing beside the patrol car, he testified: "I could not say Bruton is the man I saw; it was a light skinned man like that." The State's evidence clearly shows that Reaves and Allen did not tarry long after Smith ran into the cornfield with the Patrolman following him.

The State introduced some thirty-five or forty witnesses in the trial below, and of the witnesses who testified that they passed along Highway 401 and saw the Patrolman talking to the occupants of the 1957

black Chevrolet, or that they saw a patrol car parked on the highway, each one of them either placed Bruton or a "light skinned man" talking to the Patrolman beside the Chevrolet or standing beside the patrol car. None of these witnesses testified that he or she saw the patrol car parked on the highway with no person near it. Without exception, these witnesses testified that Bruton was standing by or near the patrol car or that a "light skinned man" was at the patrol car.

The evidence further disclosed that when Mrs. Wyatt Upchurch drove along this highway and saw the dark skinned man coming out of the cornfield, she saw the light skinned man standing back of the patrol car. Mrs. Upchurch, it appears from the evidence, was the last witness to see the patrol car before it was driven into the woods.

Furthermore, if it be conceded that Bruton told the officers everything which they testified he did tell them, then Bruton was not placed in the cornfield until sometime after the four shots were fired and Smith had returned to the highway; that Patrolman Herbin was dead when Bruton saw him at the place where he was later found.

In the case of *S. v. Ham*, 238 N.C. 94, 76 S.E. 2d 346, this Court, in substance, held that in order to render one who does not actually participate in the commission of the crime guilty of the offense committed, there must be some evidence tending to show that he, by word or deed, gave active encouragement to the perpetrator or perpetrators of the crime, or by his conduct made it known to such perpetrator or perpetrators that he was standing by to render assistance when and if it should become necessary.

In *S. v. Birchfield*, 235 N.C. 410, 70 S.E. 2d 5, Ervin, J., speaking for the Court, said: "The mere presence of a person at the scene of a crime at the time of its commission does not make him a principal in the second degree; and this is so even though he makes no effort to prevent the crime, or even though he may silently approve of the crime, or even though he may secretly intend to assist the perpetrator in the commission of the crime in case his aid becomes necessary to its consummation. *S. v. Hart*, 186 N.C. 582, 120 S.E. 345; *S. v. Hildreth*, 31 N.C. 440, 51 Am. D. 369." See also *S. v. Burgess*, 245 N.C. 304, 96 S.E. 2d 54 and *S. v. Banks*, 242 N.C. 304, 87 S.E. 2d 558.

When the officers took Bruton to Smith's cell for the purpose of having him repeat a statement that Patrolman Williamson testified Bruton had made to him and Sheriff Barrington, Bruton requested permission to ask Smith some questions. Permission was granted; but when these officers realized that the questions asked by Bruton and the answer given by Smith tended to exculpate Bruton from having been with Smith in the cornfield, these officers stopped the questioning. Un-

der the circumstances, Bruton was fully justified in declining to make any further statements before Smith.

In the case of *S. v. Carter*, 254 N.C. 475, 119 S.E. 2d 461, this Court said: "When the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements. *S. v. Todd*, 222 N.C. 346, 23 S.E. 2d 47; *S. v. Boyd*, 223 N.C. 79, 25 S.E. 2d 456; *S. v. Watts*, 224 N.C. 771, 32 S.E. 2d 348; *S. v. Ray*, 229 N.C. 40, 47 S.E. 2d 494." *S. v. Gaines*, 260 N.C. 228, 132 S.E. 2d 485.

Likewise, the State did not rebut, contradict, or in any manner seek to refute the testimony of the defendant to the effect that upon his arrest he was placed in the back seat of the officer's car and his left hand was handcuffed to Smith's right hand and they were carried from Pinehurst to Raeford in that condition. This constituted defendant's explanation of why he had certain chemicals on the back of his left hand.

On a motion to nonsuit, the defendant's evidence which explains or makes clear the evidence of the State may be considered. Strong's North Carolina Index, Vol. I, Criminal Law, § 99; *S. v. Nall*, 239 N.C. 60, 79 S.E. 2d 354; *S. v. Smith*, 237 N.C. 1, 74 S.E. 2d 291; *S. v. Bryant*, 235 N.C. 420, 70 S.E. 2d 186; *S. v. Sears*, 235 N.C. 623, 70 S.E. 2d 907.

On a motion for nonsuit, the foregoing rule also permits the consideration of defendant's evidence which rebuts the inference of guilt when it is not inconsistent with the State's evidence. *S. v. Oldham*, 224 N.C. 415, 30 S.E. 2d 318.

No one would attempt to minimize the atrocious and indefensible conduct of the person who murdered Patrolman Herbin. Even so, this defendant is entitled to his liberty unless the State's evidence was sufficient to support his conviction.

After a careful consideration of all the State's evidence, and so much of the defendant's evidence as it is permissible for us to consider on a motion for judgment as of nonsuit or for a directed verdict, we have concluded that the evidence against this defendant is insufficient to sustain the verdict rendered below. Therefore, the judgment entered by the court below is

Reversed.

PARKER, J., dissents.