STATE v. BRASWELL

[225 N.C. App. 734 (2013)]

———

STATE OF NORTH CAROLINA
v.
PHILLIP DALTON BRASWELL

No. COA12-876

Filed 5 March 2013

**False Pretense—obtaining property having value more than $100,000—motion to dismiss erroneously denied—failure to show intent to deceive**

The trial court erred by denying defendant's motion to dismiss the charge of obtaining property having a value of more than $100,000 by false pretenses. The State failed to offer sufficient evidence to establish that defendant made a false representation with the intent to deceive.

Appeal by defendant from judgment entered 8 February 2012 by Judge Wayland J. Sermons, Jr., in Nash County Superior Court. Heard in the Court of Appeals 10 December 2012.

*Attorney General Roy Cooper, by Assistant Attorney General Larissa S. Williamson, for the State.*

*Heather L. Rattelade for Defendant-appellant.*

ERVIN, Judge.

**STATE v. BRASWELL**

[225 N.C. App. 734 (2013)]

Defendant Phillip Dalton Braswell appeals from a judgment sentencing him to 58 to 79 months imprisonment based upon his conviction of obtaining property having a value of more than $100,000 by false pretenses. On appeal, Defendant argues that the trial court erred by denying his motion to dismiss the charge that had been lodged against him on the grounds that the record did not contain sufficient evidence to support his conviction. After careful consideration of Defendant's challenge to the trial court's judgment in light of the record and the applicable law, we conclude that Defendant's argument has merit and that his conviction should be vacated.

## I. Factual Background

### A. Substantive Facts

William Greene, who is married to Ola Beth Greene and is Defendant's uncle, had known Defendant all his life. Mr. Greene trusted Defendant because he had "been a good boy all his life." Defendant "lived very conservative[ly]" with his mother, "never spent no money," drove "a $300 car," ate "at cheap places," and did not take expensive vacations.

After working at a Ford dealership for nineteen years, Defendant left that position in 1997 or 1998 in order to become a "self-employed investor." In 1998, Defendant told the Greenes that he could obtain a better return than the rate of interest that they were currently receiving from their bank by investing money in the stock market, and offered to pay Mr. Greene 10% interest in the event that Mr. Greene loaned him money which Defendant would then invest. Defendant did not, however, claim to be a licensed investment advisor and was not licensed to engage in banking or the selling of investment vehicles.

After agreeing to Defendant's proposition, Mr. Greene loaned Defendant $10,000 in 1998. At the time of this transaction, Defendant and Mr. Greene executed an agreement in which Defendant agreed to repay the principal amount of the loan, plus 10% interest, to Mr. Greene in one year. However, after the initial one-year term came to an end, Mr. Greene, instead of seeking repayment, renewed the loan for an additional year at 10% interest. The new arrangement, which Mr. Greene described as "rolling over" the loan, was memorialized in a document in which Defendant promised to pay Mr. Greene $12,100 at the end of the second year, with this amount consisting of the $11,000 that Mr. Greene was owed at the end of the first year and an additional $1,100 in interest that would accrue to the second year of

the loan. Each year between 1998 and 2009, the loan was "rolled over" again. As a result, by October 2008, Defendant owed Mr. Greene a principal amount of $19,636 and $1,179 in interest relating to the original loan.[1]

Mr. Greene loaned Defendant additional sums totaling $86,800 between 1998 and 2006 under the same sort of arrangement. In light of these transactions, Mr. Greene expected to be repaid a total of $144,116, including interest. On each occasion on which Mr. Greene loaned additional money to Defendant or agreed to extend an existing loan for another year, the parties executed a new agreement which memorialized the "rolling over" of the loan in question and detailed the amount that Defendant was obligated to repay to Mr. Greene at the end of the new loan period. These agreements specified the interest rate and due date, but did not include any terms relating to Defendant's use of the money. Although Mr. Greene knew that Defendant was "playing the stock market," at some point Defendant told Mr. Greene that he had "quit messing with the stock market" and had become involved in "day trading." Mr. Greene had never heard of "day trading" and did not ask Defendant to explain what it was.

In addition, Ms. Greene loaned Defendant money between 1998 and 2006. Ms. Greene did not know the total amount that she had loaned Defendant since Mr. Greene "ke[pt] up with [the] business part." However, Ms. Greene believed that the total amount that she had loaned Defendant, when combined with the amount that Mr. Greene had loaned him, totaled more than $100,000. As was the case with the transactions involving Mr. Greene, Defendant and Ms. Greene would execute an agreement extending each loan as it came due. Mr. Green and his wife loaned Defendant a total amount in excess of $112,000 and expected to be repaid in excess of $184,000. The loans made by Mr. Greene to Defendant totaled approximately $86,000, for which he expected a return of $144,116. The loans made by Mrs. Greene to Defendant totaled approximately $25,500, for which she expected a return of $36,396.

Although these loans continued to be made for nearly a decade, the Greenes never asked to be repaid any of the principal or the interest associated with these loans or sought to obtain any information concerning any aspect of Defendant's use of the money. Similarly, Defendant never paid any money to the Greenes or provided them

---

1. At some point during this interval, Defendant reduced the interest rate associated with these loans from 10% to 6%.

with bank statements or any other sort of documentation relating to these investments. As a result, Mr. Greene never knew how much of the money that he and his wife had invested with Defendant was in Defendant's possession at any specific time. Mr. Greene did ask Defendant about a "Form 1099" annually and was told that Defendant would "tak[e] care of it."

In August or September 2009, the Greenes asked Defendant to repay one of the $10,000 loans so that they could assist their granddaughter with her college tuition expenses. At that point, Defendant told the Greenes that, while he did not have the money, he was "working on it." When Mr. Greene asked for his money several times during the fall of 2009, Defendant reiterated that he was still "working on it." In December 2009, the Greenes met with Defendant and asked him to explain why they could not get access to their money. At that point, Defendant admitted that he had lost his own money and the monies that had been loaned to him by the Greenes and that he did not have the ability to repay them.

On 4 February 2010, "Mr. and Mrs. Greene [went] to the police department to report a fraud concerning some money that they had invested with [Defendant.]" After speaking with the Greenes, who claimed to have lost $112,500, and reviewing certain documents, Officer Brandon Medina of the Rocky Mount Police Department obtained a warrant authorizing a search of Defendant's home, which he executed on 9 February 2010. At that time, Officer Medina "ended up seizing 26 items," including "computers[;] towers[;] thumb drives[;]" "tax returns" from 2003 through 2008; statements from RBC, Bank of America, First South, Fidelity Investments, and MBNA; delinquency notices from "the IRS, the City of Rocky Mount, HSBC, [and] FIA[;]" and "a couple of blank Fidelity Investment checkbooks[.]" As of the beginning of 2008, Defendant's account with Fidelity Investments, with whom he had been making investments in his own name, contained over $100,000. By the end of that year, however, the account had essentially no value.

After being placed under arrest and waiving his *Miranda* rights, Defendant gave a statement, in which he said, in pertinent part, that:

> I began investing in stocks to try to make a living in late 1998. I had mentioned to my uncle, Willie Greene, that I could pay him higher interest than a CD so he started investing some money with me too. I took this money and invested [in] stocks along with my own. I did real

well for a while but then things started to change. I started losing money. I began to borrow from real estate from my mom owned with her permission to recoup my losses. . . . Eventually I had lost my money along with my mom's and my uncle's and aunt's. In May 2008, I had an accident which I was expecting a settlement. I haven't received the settlement yet, but between that [and] work I was expecting to make some or all of what I . . . owed my uncle and aunt. They had been rolling over their investments with me and I thought I would have several years to come up with the money. In September 2009, Willie said that he wanted to cash in one of his investments. I asked him to wait a while and I was going to try to come up with money but didn't. My aunt asked me on December 8, 2009 about their investments and I told them that I had lost their money. I had taken my money that I borrowed from my mom's property and some other money she had to try to invest to rectify the situation. But sadly it went from bad to worse when I had lost that too. . . .

In addition, Defendant told Officer Medina that he had been trying to earn back money he had lost since his "financial situation had gotten worse" about six years earlier and that he had borrowed against the equity that he and his mother had in certain real estate that they owned in an effort to achieve that goal. Defendant did not identify either the date or year when he had lost the money loaned by Mr. and Ms. Greene.

### B. Procedural History

On 8 February 2010, a warrant for arrest charging Defendant with obtaining property with a value in excess of $100,000 by false pretenses was issued. On 5 April 2010, the Nash County grand jury returned a bill of indictment charging Defendant with one count of obtaining property with a value of more than $100,000 by false pretenses. The charge against Defendant came on for trial before the trial court and a jury at the 6 February 2012 criminal session of Nash County Superior Court. At the conclusion of the State's evidence, Defendant unsuccessfully sought dismissal of the charge that had been lodged against him on the grounds that the State had failed to present sufficient evidence to support a conviction. After electing to refrain from presenting any evidence, Defendant unsuccessfully

renewed his dismissal motion. On 8 February 2012, the jury returned a verdict convicting Defendant as charged. At the conclusion of the ensuing sentencing hearing, the trial court sentenced Defendant to a term of 58 to 79 months imprisonment. Defendant noted an appeal to this Court from the trial court's judgment.

## II. Legal Analysis

### A. Standard of Review

"In order to justify the denial of a motion to dismiss for insufficient evidence, the State must present substantial evidence of '(1) each essential element of the [charged offense] and (2) defendant's being the perpetrator of such offense.' Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' On appeal, we view 'the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences.' We review a trial court's decision to deny a motion to dismiss for insufficient evidence *de novo.*" *State v. Privette,* ___ N.C. App ___, ___, 721 S.E.2d 299, 308-09 (quoting *State v. Johnson,* 203 N.C. App. 718, 724, 693 S.E.2d 145, 148 (2010) (citation omitted); *State v. Smith,* 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980), and *State v. Morgan,* 359 N.C. 131, 161, 604 S.E.2d 886, 904 (2004), *cert. denied,* 546 U.S. 830, 126 S. Ct. 47, 163 L. Ed. 2d 79 (2005) (additional citation omitted), *disc. rev. denied,* ___ N.C. ___, 724 S.E.2d 532 (2012).

### B. Sufficiency of the Evidence

In his brief, Defendant argues that the trial court erred by denying his dismissal motion on the grounds that the record does not contain sufficient evidence to support his conviction. More specifically, Defendant contends that the evidence, when taken in the light most favorable to the State, did not tend to show that Defendant had made a false statement as alleged in the indictment or that Defendant acted with an intent to deceive or defraud and, instead, merely tended to show that he had failed to fulfill a contractual obligation. Defendant's argument has merit.

"Obtaining property by false pretenses is defined as (1) a false representation of a past or subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which the defendant obtains or attempts to obtain anything of value from another person. [N.C. Gen. Stat. §] 14-100(a). A key element of the offense is that the representation be intention-

ally false and deceptive." *State v. Compton*, 90 N.C. App. 101, 103, 367 S.E.2d 353, 354 (1988) (citing *State v. Cronin*, 299 N.C. 229, 242, 262 S.E. 2d 277, 286 (1980), and *State v. Kelly*, 75 N.C. App. 461, 463-64, 331 S.E. 2d 227, 230 *disc. rev. denied*, 315 N.C. 187, 339 S.E. 2d 409 (1985)). In view of the fact " 'that an indictment, whether at common law or under a statute, to be good must allege lucidly and accurately all the essential elements of the offense endeavored to be charged,' " *Cronin*, 299 N.C. at 234, 262 S.E.2d at 281 (quoting *State v. Greer*, 238 N.C. 325, 327, 77 S.E. 2d 917, 919 (1953)), to sustain a charge of obtaining property by false pretenses, the indictment must state the alleged false representation. *See, e.g., State v. Linker*, 309 N.C. 612, 614-15, 308 S.E.2d 309, 310-11 (1983).

> The gist of obtaining property by false pretense is the false representation of a . . . fact intended to and which does deceive one from whom property is obtained. The state must prove, as an essential element of the crime, that defendant made the misrepresentation as alleged. If the state's evidence fails to establish that defendant made this misrepresentation but tends to show some other misrepresentation was made, then the state's proof varies fatally from the indictments.

*Id.* (citing *Cronin*, 299 N.C. at 242, 262 S.E. 2d at 286; *State v. Yancey*, 228 N.C. 313, 317-18, 45 S.E. 2d 348, 351 (1947), *State v. Carlson*, 171 N.C. 818, 826, 89 S.E. 30, 34 (1916); and *State v. Keziah*, 258 N.C. 52, 54, 127 S.E. 2d 784, 786 (1962)). The falsity of the defendant's representation and the defendant's fraudulent intent must frequently be established through the use of circumstantial evidence:

> An essential element of the crime described in [N.C. Gen. Stat. §] 14-100 is that the act be done "knowingly and designedly . . . with intent to cheat or defraud." Intent is "seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred." In determining the absence or presence of intent, the jury may consider "the acts and conduct of the defendant and the general circumstances existing at the time of the alleged commission of the offense charged."

*State v. Bennett*, 84 N.C. App. 689, 691, 353 S.E.2d 690, 691-92 (1987) (quoting *State v. Hines*, 54 N.C. App. 529, 533, 284 S.E. 2d 164, 167 (1981)). According to N.C. Gen. Stat. § 14-100(b), "[e]vidence of non-

STATE v. BRASWELL

[225 N.C. App. 734 (2013)]

fulfillment of a contract obligation standing alone shall not establish the essential element of intent to defraud."

In this case, the indictment returned against Defendant alleged, in pertinent part, that Defendant:

> . . . unlawfully, willfully and feloniously did knowingly and designedly with the intent to cheat and defraud, obtain $112,500.00 in U.S. Currency from William Irvin Green and Ola Beth Green, by means of a false pretense which was calculated to deceive and did deceive.
>
> The false pretense consisted of the following: this property was obtained by the defendant guaranteeing a six percent return on all invested monies from William Irvin Green and Ola Beth Green, when in fact the defendant did not invest the monies into legitimate financial institutions.

The most logical interpretation of the allegations contained in the indictment returned against Defendant in this case is that Defendant falsely represented that he would earn a six percent return for the Greenes by investing their money when, in reality, he intended to defraud the Greenes by simply taking their money rather than investing it in "legitimate financial institutions." In other words, the "false pretense" or "false representation" which Defendant allegedly made to the Greenes consisted of a statement that Defendant was borrowing money from the Greenes for investment-related purposes despite the fact that he did not actually intend to invest the money that he received from them in any "legitimate financial institution." A careful review of the record developed at trial reveals the complete absence of any support for this allegation.

As an initial matter, the State did not present any evidence tending to show that Defendant failed to invest the Greenes' money in "legitimate financial institutions." For example, the State did not utilize any of the records seized from Defendant's residence to show that Defendant had not, in fact, invested the money that he received from the Greenes. On the contrary, the fact that Defendant's account with Fidelity Investments contained $100,000 in early 2008 suggests that he did, in fact, make investments with such institutions.[2]

---

2. This inference is bolstered by the information contained in the statement which Defendant gave to Officer Medina, in which he indicated that he had invested the money that he had received from the Greenes and that, after a certain point in time, his invest-

Although the State contends that the fact that the Fidelity Investment account was held by Defendant personally rather than in the name of the Greenes shows that his representation that the Greenes' money would be invested in "legitimate financial institutions" was a false one, we do not find this contention persuasive given the absence of any evidence tending to show that Defendant ever represented that he would keep the Greenes' money separate from his own personal investments and the fact that Defendant did not, as a practical matter, appear to have any other way of carrying out his promise to the Greenes. As a result, the record simply does not show that the representation that Defendant allegedly made to the Greenes was a false one.

In addition, we note that the State offered no direct or circumstantial evidence tending to show that, instead of investing the money he borrowed from the Greenes, Defendant converted it to his own use. For example, the State presented no evidence tending to show that Defendant had used the money that he obtained from the Greenes to make any significant personal expenditures, such as the payment of travel costs or the purchase of real estate, motor vehicles, or other items, at any time between 1998 and 2009. On the contrary, the undisputed record evidence tends to show that Defendant lived with his mother and led a "conservative" lifestyle as a part of which he took no vacations, dined at "cheap restaurants," and drove a "$300 car." As a result, we conclude that the State failed to offer sufficient evidence to establish that Defendant made a false representation with the intent to deceive when he told the Greenes that he intended to invest the money that they loaned to him in "legitimate financial institutions" and would repay it with interest at the specified time and that the record evidence, taken in the light most favorable to the State, simply tends to show that Defendant, after seriously overestimating his own investing skills, made a promise that he was unable to keep.

In urging us to reach a contrary conclusion, the State notes that Defendant "never indicated that there was no money for Mr. Greene to roll over and actually reassured Mr. Greene that his money was safe." This argument presupposes, however, that Defendant had

---

ment activities had gone catastrophically awry. As a result of the fact that, " '[w]hen the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements,' " *State v. Bruton*, 264 N.C. 488, 499, 142 S.E.2d 169, 176 (1965) (quoting *State v. Carter*, 254 N.C. 475, 479, 119 S.E. 2d 461, 464 (1961)), we are entitled to consider Defendant's statement for the purpose of determining whether the record adequately supports his conviction.

**STATE v. BRASWELL**

[225 N.C. App. 734 (2013)]

already lost all of the money that he had previously borrowed from the Greenes at a time when he was still obtaining additional loans from them. However, despite seizing Defendant's computers and numerous financial and tax-related records, the State never elicited any evidence tending to show that, as of the date of any particular loan from Mr. or Ms. Greene to Defendant, Defendant had already lost all of the money that they had previously provided to him. Similarly, the record does not establish the date upon which Defendant told Mr. Greene that his money was "safe" and simply indicates that this statement was made at an unspecified point in time when the "market went down." Moreover, even if Defendant was reluctant to admit that he had lost the Greenes' money through bad investments, such behavior would not tend to show that Defendant had failed to invest the Greenes' money with "legitimate financial institutions" to begin with.

In addition, the State asserts that Defendant "never showed Mr. Greene a bank statement or any account information to confirm that the money was actually invested somewhere." Although the State correctly points out that Defendant never provided the Greenes with any information concerning the manner in which he had invested the money that they had loaned to him, we are unable to see how this evidence tends to establish that Defendant did not invest the Greenes' money in "legitimate financial institutions" in the first place. The record contains no indication that Defendant had any obligation to consult with either of the Greenes about the manner in which he intended to invest their money or to provide them with information concerning the nature and extent of his investment decisions. On the contrary, the Greenes' testimony clearly establishes that they never asked for information about the status of their investments and appeared to have had little to no interest in receiving information about that subject. As a result, the fact that Defendant never provided the Greenes with any information concerning the status of their investments does not tend to show that Defendant falsely represented that he would take the money that they loaned to him and invest it in "legitimate financial institutions."

Furthermore, the State emphasizes Mr. Greene's testimony to the effect that Defendant "never produced a 1099 form so that Mr. Greene could include the investment as part of his taxes" and argues that Defendant's failure to provide such a tax reporting document tends to show that Defendant did not invest the money that he had borrowed from the Greenes. Once again, however, we are unable to infer that Defendant never intended to invest the money that he obtained from

the Greenes in "legitimate financial institutions" from the fact that Defendant failed to provide them with a Form 1099. Aside from the fact that the State did not establish that the Greenes were ever entitled to receive such a document from Defendant, the fact that Defendant may have failed to inform the Internal Revenue Service of any interest income that the Greenes might have earned does not, as a logical matter, tend to show that Defendant never intended to invest the monies that he received from them in "legitimate financial institutions" in the first place.

Finally, the State notes that Defendant told Officer Medina that he had been trying to earn the money needed to repay the Greenes for six years and suggests that, given that Officer Medina spoke with Defendant in 2010, Defendant had lost all of the money that he had borrowed from the Greenes by 2004. The record does not, however, contain any information tending to show the total amount of money in Defendant's actual possession in 2004 or at any other time. In addition, the undisputed record evidence tends to show that Defendant had at least $100,000 in an investment account as of January 2008. Furthermore, even if Defendant had lost all the money that he had invested for the Greenes by a particular date, that fact would not tend to show that he had failed to invest the Greenes' money in "legitimate financial institutions." As a result, none of the State's efforts to convince us that the record does, in fact, contain sufficient evidence to support Defendant's conviction are persuasive.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that the record does not contain sufficient evidence tending to show that Defendant failed to invest the money that he borrowed from the Greenes in "legitimate financial institutions" to support Defendant's conviction for obtaining property by false pretenses and that the trial court should have granted Defendant's dismissal motion. As a result, the trial court's judgment should be, and hereby is, vacated.

VACATED.

Chief Judge MARTIN and Judge GEER concur.