DAVIS, Judge.
 

 *635
 
 Stephanie Jean Holanek ("Defendant") appeals from her convictions for three counts of obtaining property by false pretenses. On appeal, Defendant contends that the trial court erred in (1) denying her motion to dismiss the charges of obtaining property by false pretenses based on the insufficiency of the evidence; (2) its instructions to the jury concerning the elements of obtaining property by false pretenses; (3) admitting testimony that Defendant did not appear for an examination under oath in connection with the claims she filed with her insurance company; (4) failing to give a jury instruction pursuant to N.C. Gen.Stat. § 14-100(b) where the State introduced evidence of Defendant's breach of contract; and (5) entering judgment on her convictions because the indictments for each of the obtaining property by false pretenses charges were fatally defective. After careful review, we vacate in part and find no error in part.
 

 Factual Background
 

 The State's evidence at trial tended to establish the following facts: On 26 September 2009, Defendant's septic tank at her home in Wilmington, North Carolina backed up, causing the three toilets in her home to overflow and resulting in water damage to the first and second floors. Defendant filed a claim with her insurance company, State Farm Fire and Casualty Company ("State Farm"). A claims adjuster with State Farm, Jarred Norris ("Norris"), visited Defendant's house to document the damage. State Farm issued a check for $4,494.69 to Defendant in
 
 *636
 
 November 2009 to pay for the expenses of moving the contents of the first floor of her house into a storage unit. State Farm arranged for one of its contractors, Service Master, to perform the job.
 

 On 18 October 2009, Defendant faxed State Farm an invoice in the amount of $4,760.00 from an entity called M & M Movers that purported to be for the costs associated with moving the contents of the second floor of her house into storage. The invoice listed M & M Movers' business address as 817 West Rowan Avenue in Fayetteville, North Carolina.
 
 [1]
 
 Her fax coversheet stated that she had paid M & M Movers the amount listed on the invoice as well as an additional $474.00 for storage fees. State Farm issued a check to Defendant in the total amount of $5,234.00 to cover each of those expenses on 28 October 2009.
 

 On 12 October 2009, Defendant checked four pets into Meadowsweet Pet Boarding and Grooming ("Meadowsweet") because the temporary rental home where she was living while her home was being repaired did not allow pets. Defendant initially made an electronic reservation for the pets to remain at Meadowsweet for only ten days (from 12 October to 22 October 2009), but the checkout date on the form was then changed to reflect the fact that the pets would remain at Meadowsweet through 12 November 2009.
 

 Another claims adjuster, Chris Rowley ("Rowley"), informed Defendant that State Farm would cover pet boarding under her additional living expense coverage if she provided an estimate of the cost. Nevertheless, prior to her submission of such an estimate, State Farm issued a check to Defendant on 19 October 2009 for $2,040.00 in pet boarding expenses.
 

 Three days later, on 22 October 2009, Defendant submitted to State Farm a document that had been generated by Meadowsweet entitled "STATEMENT of CURRENT CHARGES-NOT a RECEIPT" listing the amount of $2,040.00, which reflected Meadowsweet's estimate of the pet boarding costs that would apply to the boarding of her two dogs and two cats from 12 October to 12 November 2009. On the document, Defendant wrote a handwritten note stating as follows:
 

 *230
 

 *637
 
 Please Reimburse for Pet Boarding
 

 $2,040.00 (30 days)
 

 $4,080.00 (60 days)
 

 Thanks,
 

 Stephanie Holanek
 

 State Farm proceeded to issue monthly payments to her in the amount of $2,040.00 for pet boarding expenses for approximately six months. Defendant periodically called State Farm during this time period to make sure that State Farm was continuing to issue checks for the pet boarding services.
 

 On 25 February 2010, Rowley's manager asked him to obtain confirmation that the pets were still at Meadowsweet before State Farm would issue any further checks for pet boarding expenses. On several occasions, Rowley asked Defendant to confirm that her pets were still being boarded at Meadowsweet, and Defendant told him that "she was too busy to get the information for [him] from the kennel ... but she would try and get it." State Farm ceased providing payments in April 2010, and in May 2010, Defendant told Rowley that her pets were going to be evicted because of outstanding amounts owed to Meadowsweet. Rowley then contacted Meadowsweet and learned from an employee that the animals were no longer at Meadowsweet and had been checked out back on 22 October 2009.
 
 [2]
 
 When Rowley confronted Defendant with this information over the phone, Defendant told him that she had taken her pets out of Meadowsweet and sent them with her brother to be boarded in a kennel in Fayetteville. Rowley requested the contact information for the new kennel, but Defendant never provided it to him.
 

 On 28 July 2010, Defendant faxed State Farm an invoice for moving services from a business called PJ's Moving Company, purportedly located at 6012 Oleander Drive in Wilmington, North Carolina, in the amount of $10,430.00. Defendant requested reimbursement for the moving expenses listed on the invoice, which consisted of three days of moving furniture from the temporary storage unit back into her home. A handwritten note at the top right corner of the invoice stated that the bill had been paid in full.
 

 *638
 
 Kent Dawdy ("Dawdy"), a claims representative in State Farm's special investigative unit, was assigned to investigate Defendant's insurance claim on 15 September 2010. Dawdy contacted Defendant the following day and informed her that State Farm was going to invoke a contractual policy provision allowing it to require her to submit to an examination under oath for the purpose of resolving questions about her claims. State Farm retained an attorney, J. Thomas Cox, Jr. ("Cox"), to conduct the examination. Cox mailed a letter to Defendant on 24 September 2010 requesting that she appear for the examination at a court reporter's office on 20 October 2010, and Cox's paralegal gave her a reminder call on 19 October 2010. Dawdy, Cox, and the court reporter appeared for the examination on 20 October and waited for Defendant for thirty minutes, but she did not appear. Cox then sent Defendant a letter on 28 October 2010 giving her the opportunity to schedule a new date for the examination, but she did not respond. Cox sent a third letter on 16 November 2010 informing her that the examination had been rescheduled for 30 November 2010, but, once again, she failed to appear for the examination.
 

 In the course of his investigation, Dawdy attempted to locate PJ's Moving Company but could not find the address contained in the invoice-6012 Oleander Drive in Wilmington. He also attempted to find M & M Movers at 817 Rowan Avenue in Fayetteville and instead found a house located at that address. Dawdy did not observe moving equipment or trucks at the residence. In his trial testimony, he stated that he did not recall whether he had searched the Internet or used a phone book in an effort to locate either PJ's Moving Company or M & M Movers. He explained that he did not do a more extensive search because State Farm's attorney planned to ask Defendant to provide clarifying information about these entities at the examination.
 

 *231
 
 On 9 December 2010, State Farm concluded that Defendant was not in compliance with the conditions of her policy based on her failure to appear for the scheduled examinations and denied her subsequent claims on that basis. Dawdy contacted the North Carolina Department of Insurance ("DOI") to report State Farm's suspicions that Defendant had committed insurance fraud. Mickey Biggs ("Biggs"), a criminal investigator with DOI, received the case on 12 December 2010 and began his investigation in May 2011. Biggs was unable to locate either M & M Movers or PJ's Moving Company through Internet searches, phone calls, or physical visits.
 

 On 17 January 2012, a grand jury indicted Defendant on four counts of insurance fraud, three counts of obtaining property by false pretenses,
 
 *639
 
 and one count of attempting to obtain property by false pretenses. The State voluntarily dismissed one count of insurance fraud and the charge of attempting to obtain property by false pretenses before trial.
 

 The matter came on for a jury trial beginning 4 March 2014 in New Hanover County Superior Court before the Honorable Jay D. Hockenbury. Following the State's case-in-chief, Defendant offered evidence in her defense, calling her brother, Paul Thompson, Jr. ("Thompson"), as a witness. Thompson testified that he had moved to Wilmington in July 2010 to help Defendant because she had just opened a consignment store and given birth to triplets. He further testified that (1) he was operating PJ's Moving Company out of the back of the consignment store at 6012 Oleander Drive
 
 [3]
 
 ; (2) he received referrals for his moving services from the consignment store; and (3) along with two other movers, he had moved the contents of the temporary storage unit back into Defendant's house and reassembled the furniture. Thompson also stated that he had prepared a handwritten invoice for the applicable expenses and charges that was then typed up by Defendant.
 

 On 7 March 2014, the jury found Defendant guilty of all remaining charges-three counts of insurance fraud and three counts of obtaining property by false pretenses. The trial court arrested judgment on the three counts of insurance fraud, consolidated the three counts of obtaining property by false pretenses into a single judgment, and sentenced Defendant to a mitigated term of four to five months imprisonment. Defendant gave notice of appeal in open court six days after the conclusion of her trial.
 

 Analysis
 

 I. Appellate Jurisdiction
 

 As an initial matter, we must address the issue of whether appellate jurisdiction exists over Defendant's appeal. Rule 4 of the North Carolina Rules of Appellate Procedure provides that a defendant may appeal from an order or judgment in a criminal action by (1) "giving oral notice of appeal at trial," or (2) "filing notice of appeal with the clerk of superior court and serving copies thereof upon all adverse parties within fourteen days after entry of the judgment[.]" N.C.R.App. P. 4(a).
 

 *640
 
 In the present case, Defendant's trial counsel gave oral notice of appeal on 13 March 2014, six days after the conclusion of Defendant's trial, by appearing in open court before the judge who had presided over Defendant's criminal trial. However, because oral notice of appeal must be given
 
 at trial,
 
 Defendant's counsel's oral notice of appeal was legally ineffective.
 
 See
 

 State v. Oates,
 

 366 N.C. 264
 
 , 268,
 
 732 S.E.2d 571
 
 , 574 (2012) (" Rule 4 authorizes two modes of appeal for criminal cases. The Rule permits oral notice of appeal, but only if given at the time of trial or ... of the pretrial hearing. Otherwise, notice of appeal must be in writing and filed with the clerk of court." (internal citation omitted)).
 

 In recognition of the fact that her notice of appeal was defective, Defendant has filed a petition for writ of certiorari asking this Court to consider her appeal. Pursuant to Rule 21(a)(1) of the Appellate Rules, this
 
 *232
 
 Court may, in its discretion, grant a petition for writ of certiorari and review an order or judgment entered by the trial court "when the right to prosecute an appeal has been lost by failure to take timely action." N.C.R.App. P. 21(a)(1). Here, Defendant lost her right to appeal through no fault of her own but rather due to her trial counsel's failure to give proper notice of appeal. We therefore dismiss the appeal, exercise our discretion to grant Defendant's petition for writ of certiorari, and proceed to address the merits of her arguments.
 
 See
 

 In re I.T.P-L,
 

 194 N.C.App. 453
 
 , 460,
 
 670 S.E.2d 282
 
 , 285 (2008) (dismissing appeal based on defective notice of appeal but allowing petition for writ of certiorari pursuant to Rule 21 ),
 
 disc. review denied,
 

 363 N.C. 581
 
 ,
 
 681 S.E.2d 783
 
 (2009).
 

 II. Denial of Motions to Dismiss
 

 Defendant first argues that the trial court erred in denying her motions to dismiss each of the three counts of obtaining property by false pretenses, asserting that (1) there was insufficient evidence to support the two counts arising out of the payments she received based on the moving company invoices; and (2) with regard to the count stemming from the pet boarding expenses, there was a fatal variance between the indictment and the evidence introduced at trial. We address each of Defendant's arguments in turn.
 

 A. Moving Company Invoices
 

 With regard to the counts stemming from the moving expenses, Defendant contends that the State failed to prove either that (1) the invoices contained a false representation; or (2) the movers were not paid by Defendant as she claimed. We disagree.
 

 "Upon defendant's motion for dismissal,
 
 *641
 
 the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant being the perpetrator of such offense."
 
 State v. Fritsch,
 

 351 N.C. 373
 
 , 378,
 
 526 S.E.2d 451
 
 , 455 (citation omitted),
 
 cert. denied,
 

 531 U.S. 890
 
 ,
 
 121 S.Ct. 213
 
 ,
 
 148 L.Ed.2d 150
 
 (2000). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion.
 
 State v. Smith,
 

 300 N.C. 71
 
 , 78-79,
 
 265 S.E.2d 164
 
 , 169 (1980). In reviewing challenges to the sufficiency of the evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences.
 
 State v. Benson,
 

 331 N.C. 537
 
 , 544,
 
 417 S.E.2d 756
 
 , 761 (1992).
 

 "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence."
 
 State v. Stone,
 

 323 N.C. 447
 
 , 452,
 
 373 S.E.2d 430
 
 , 433 (1988). If the court decides that a reasonable inference of the defendant's guilt may be drawn from the circumstances, then "it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty."
 
 State v. Thomas,
 

 296 N.C. 236
 
 , 244,
 
 250 S.E.2d 204
 
 , 209 (1978) (citation and emphasis omitted). The defendant's evidence should be disregarded unless it is favorable to the State or does not conflict with the State's evidence.
 
 State v. Earnhardt,
 

 307 N.C. 62
 
 , 67,
 
 296 S.E.2d 649
 
 , 653 (1982). When ruling on a motion to dismiss, the trial court should only be concerned with whether "the evidence is sufficient to get the case to the jury; it should not be concerned with the weight of the evidence."
 
 Id.
 
 at 67,
 
 296 S.E.2d at 652
 
 .
 

 The elements of the offense of obtaining property by false pretenses are: "(1) a false representation of a subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which one person obtains or attempts to obtain value from another."
 
 State v. Cronin,
 

 299 N.C. 229
 
 , 242,
 
 262 S.E.2d 277
 
 , 286 (1980). Defendant argues that the State failed to prove that Defendant made a false representation because it "failed to prove that [Defendant] did not pay the invoices as claimed."
 

 In making this argument, Defendant relies primarily upon
 
 State v. Braswell,
 

 225 N.C.App. 734
 
 ,
 
 738 S.E.2d 229
 
 (2013). In
 
 Braswell,
 
 the defendant was charged with obtaining property by false pretenses by
 
 *233
 
 means of an indictment alleging that he obtained $112,500.00 from William Irvin Greene and Ola Beth Greene "by the defendant guaranteeing
 
 *642
 
 a six percent return on all invested monies from William Irvin Green [sic] and Ola Beth Green [sic], when in fact the defendant did not invest the monies into legitimate financial institutions."
 
 Id.
 
 at 741,
 
 738 S.E.2d at 233
 
 . On appeal, this Court held that the trial court had erred in denying the defendant's motion to dismiss because the state failed to present evidence demonstrating that the defendant failed to invest the money he obtained from the Greenes in legitimate financial institutions and thus did not establish that "the representation that Defendant allegedly made to the Greenes was a false one."
 
 Id.
 
 at 742,
 
 738 S.E.2d at 234
 
 . We noted that the state did not present any evidence concerning the defendant's financial records or offer any other "direct or circumstantial evidence tending to show that, instead of investing the money he borrowed from the Greenes, Defendant converted it to his own use."
 
 Id.
 
 at 742,
 
 738 S.E.2d at 234
 
 . Because the state did not offer any evidence explaining what had happened to the money the defendant obtained from the alleged victims, we concluded that the state (1) failed to prove that the defendant never invested the money in legitimate financial institutions as he had promised and, consequently, (2) did not establish the "key element of the offense ... that the representation be intentionally false and deceptive."
 
 Id.
 
 at 739-40,
 
 738 S.E.2d at 233
 
 . Indeed, we observed that the evidence at trial suggested that the defendant had actually invested the Greenes' money but then lost the funds when "his investment activities had gone catastrophically awry."
 

 Id.
 

 at 742 n. 2,
 
 738 S.E.2d at
 
 234 n. 2.
 

 Defendant contends that the same result should apply here because the State neither introduced any of her financial records nor otherwise proved that she did not, in fact, pay the invoices as she had represented. She further argues that the State failed to establish that M & M Movers or PJ's Moving Company did not exist and, therefore, the evidence did not support the conclusion that Defendant made a false representation to State Farm by submitting to it the invoices for the moving expenses in order to obtain payment. We are not persuaded.
 

 The State presented evidence that during their respective investigations, neither Dawdy nor Biggs were able to uncover any evidence that M & M Movers or PJ's Moving Company were operating as moving companies in North Carolina. Both investigators testified that the companies (1) were not physically located at the addresses listed on the invoices; (2) were unreachable at the telephone numbers provided therein; and (3) could not be located through an Internet search. Moreover, Defendant resisted State Farm's attempts to afford her an opportunity
 
 *643
 
 to demonstrate the legitimacy of these expenses by repeatedly failing to appear for scheduled examinations under oath.
 
 [4]
 

 By offering substantial evidence that the moving companies did not exist, the State was able to raise a question for the jury as to whether Defendant's submission of the invoices to State Farm claiming that payment had been made by her to these companies constituted a false representation. Because the State offered evidence sufficient to allow the jury to determine that these invoices were fraudulent, it was not obligated to show what happened to the money Defendant obtained from State Farm in order to prove her guilt.
 

 Conversely, in
 
 Braswell,
 
 evidence of what had transpired with the funds obtained from the alleged victims
 
 was
 
 essential to proving the falsity of the defendant's representation in that case. In
 
 Braswell,
 
 the false representation alleged to have been made by the defendant was that he had promised to "invest the monies into legitimate financial institutions."
 
 Id.
 
 at 741,
 
 738 S.E.2d at 233
 
 . In order to prove that this representation was false and intended to defraud the alleged victims, the state was required to show that the defendant did not actually invest the money at issue. The state did not do so and, therefore, failed to establish that the defendant
 
 *234
 
 made a false representation. Thus,
 
 Braswell
 
 is distinguishable from the present case, and Defendant's reliance on it is misplaced.
 

 We conclude that sufficient evidence existed to support a finding by the jury that the two moving companies were fictitious and that by submitting the invoices, Defendant falsely represented that the invoices were legitimate in an effort to defraud State Farm and receive payment from it. Her submission of these invoices ultimately resulted in her obtaining $15,190.00 from State Farm. Accordingly, the trial court did not err in denying her motion to dismiss as to these two counts.
 

 B. Pet Boarding Expenses
 

 Defendant next argues that there was a fatal variance between the facts alleged in the indictment and the evidence presented at trial for the count of obtaining property by false pretenses concerning the Meadowsweet pet boarding charges. She acknowledges that her trial counsel did not specifically argue fatal variance as the basis for the motion to dismiss this count and thus failed to preserve this issue for
 
 *644
 
 appellate review.
 
 See
 

 State v. Redman,
 

 224 N.C.App. 363
 
 , 367-68,
 
 736 S.E.2d 545
 
 , 549 (2012) ("To preserve the issue of a fatal variance for review, a defendant must state at trial that a fatal variance is the basis for the motion to dismiss."). However, she contends that her counsel's failure to identify the fatal variance between the indictment and the evidence at trial constitutes ineffective assistance of counsel because the motion to dismiss would have been granted if her trial counsel had expressly made a motion to dismiss on this specific ground. We agree.
 

 In order to establish ineffective assistance of counsel, "a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense."
 
 State v. Phillips,
 

 365 N.C. 103
 
 , 118,
 
 711 S.E.2d 122
 
 , 135 (2011) (citation and quotation marks omitted),
 
 cert. denied,
 
 - -- U.S. ----,
 
 132 S.Ct. 1541
 
 ,
 
 182 L.Ed.2d 176
 
 (2012).
 

 Deficient performance may be established by showing that counsel's representation fell below an objective standard of reasonableness. Generally, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 

 State v. Allen,
 

 360 N.C. 297
 
 , 316,
 
 626 S.E.2d 271
 
 , 286 (internal citations and quotation marks omitted),
 
 cert. denied,
 

 549 U.S. 867
 
 ,
 
 127 S.Ct. 164
 
 ,
 
 166 L.Ed.2d 116
 
 (2006).
 

 "It is well established that a defendant must be convicted, if at all, of the particular offense charged in the indictment and that the State's proof must conform to the specific allegations contained therein."
 
 State v. Henry,
 
 --- N.C.App. ----, ----,
 
 765 S.E.2d 94
 
 , 102 (2014) (citation, quotation marks, and brackets omitted). "A variance occurs where the allegations in an indictment ... do not conform to the evidence actually established at trial."
 
 State v. Norman,
 

 149 N.C.App. 588
 
 , 594,
 
 562 S.E.2d 453
 
 , 457 (2002). In order for it to be material, and therefore require reversal, the variance must involve an essential element of the crime charged.
 
 See
 

 State v. Glynn,
 

 178 N.C.App. 689
 
 , 696,
 
 632 S.E.2d 551
 
 , 556 ("Only a material variance warrants reversal, as it involves an essential element of the alleged crime."),
 
 appeal dismissed and disc. review denied,
 

 360 N.C. 651
 
 ,
 
 637 S.E.2d 180
 
 -81 (2006).
 

 The purposes of an indictment are: "(1) to identify the crime with which defendant is charged, (2) to protect defendant against being
 
 *645
 
 charged twice for the same offense, (3) to provide defendant with a basis on which to prepare a defense, and (4) to guide the court in sentencing."
 
 State v. Wright,
 

 200 N.C.App. 578
 
 , 585,
 
 685 S.E.2d 109
 
 , 114 (2009) (citation and quotation marks omitted),
 
 appeal dismissed,
 

 363 N.C. 812
 
 ,
 
 693 S.E.2d 142
 
 (2010). "When a variance exists between allegations in the indictment and evidence presented at trial, the defendant may be deprived of adequate notice to prepare a defense."
 
 Glynn,
 

 178 N.C.App. at 696
 
 ,
 
 632 S.E.2d at 556
 
 .
 
 *235
 
 Here, the indictment for this count of obtaining property by false pretenses alleged the following:
 

 [T]he defendant named above unlawfully, willfully, and feloniously did knowingly and designedly with intent to cheat and defraud, obtain $11,395.00 in U.S. currency from State Farm Fire and Casualty Company by means of a false pretense which was calculated to deceive and did deceive. The false pretense consisted of the following: this property was obtained when the defendant submitted an invoice for services rendered by Meadowsweet Pet Boarding & Grooming, seeking reimbursement from State Farm Fire and Casualty Company under the terms of the defendant's Home Owner Insurance Policy, when in fact the invoice submitted was a fraudulent invoice.
 

 Thus, the theory of the offense alleged in the indictment was that Defendant submitted a fraudulent invoice for pet boarding services rendered by Meadowsweet to State Farm, which caused State Farm to issue payment to her in the amount of $11,395.00. The evidence at trial, however, tended to show that the document at issue was an
 
 estimate
 
 -not "an invoice for services rendered"-for the cost of boarding the four pets for one month, which was generated by Meadowsweet on 12 October 2009 (the day of the pets' arrival at Meadowsweet). Leanna Willard ("Willard"), the owner of Meadowsweet, testified as follows:
 

 [Prosecutor]: I want to show you what's previously been admitted as State's Exhibit 16. Do you recognize this document?
 

 [Willard]: It is an estimate of charges for Stephanie Holanek's four animals from October 12th, 2009 to November 12th, 2009.
 

 Q. At what facility?
 

 *646
 
 A. Meadowsweet Pet Boarding and Grooming.
 

 Q. Your facility, correct?
 

 A. Yes.
 

 Q. And, again, let's go through it again. An estimate, how do you know this is an estimate, not a receipt?
 

 A. Because it says "Statement of current charges," not "Receipt" at the top. And at the bottom it has a total of $2,040.00 where a receipt would show the paid amount and it would show how it was paid: check, credit card, cash, et cetera.
 

 Q. Does this appear to be legitimate?
 

 A. Yes, it's an estimate for a 30-day stay for the four animals, yes.
 
 [5]
 

 We note that because this document was generated on the same date the pets were checked into Meadowsweet, it could not logically have been an invoice "for services
 
 rendered
 
 by Meadowsweet" as alleged in the indictment. (Emphasis added.) Indeed, the evidence at trial showed that Rowley, the State Farm claims adjuster, was aware that the document was an estimate as Rowley testified that (1) Defendant had provided this document to him after he requested information "on what it would cost to board her pets during the time she was out of the home"; and (2) it was his understanding that "this was an estimate ... since her dogs hadn't been boarded there for more than 30 days." For similar reasons, Defendant's handwritten note on the document requesting reimbursement could not have been construed by State Farm as a request for payment as to services that had actually been rendered given that the document was faxed by Defendant only ten days after the 12 October 2009 date reflected on the document as the date the pets were
 
 first placed
 
 with Meadowsweet.
 

 Furthermore, there was no evidence at trial suggesting that the written estimate was anything other than a document created in good faith by Meadowsweet that accurately itemized the costs to be incurred
 
 *647
 
 -prospectively-for the boarding of Defendant's pets from 12 October 2009 to 12 November 2009. Thus, in addition to the fact that the document Defendant submitted from Meadowsweet was not an invoice, it was also not fraudulent.
 

 Notably, this document was faxed to State Farm on 22 October 2009, three days
 
 after
 

 *236
 
 State Farm issued a check to Defendant. Therefore, the issuance of this payment by State Farm could not logically have been triggered by Defendant's submission of the document.
 
 See
 

 State v. Childers,
 

 80 N.C.App. 236
 
 , 241,
 
 341 S.E.2d 760
 
 , 763 (explaining that offense of obtaining property by false pretenses requires "a causal connection between the alleged false representation and the obtaining of the property or money"),
 
 disc. review denied,
 

 317 N.C. 337
 
 ,
 
 346 S.E.2d 142
 
 (1986).
 

 In addition, the State's evidence at trial tended to show that it was not the written estimate that falsely led State Farm to believe that her pets remained at Meadowsweet long after they had been removed from Meadowsweet's care but rather the
 
 oral
 
 misrepresentations made by Defendant during the time period between 22 October 2009 and April 2010. Thus, contrary to the allegations contained in the indictment that Defendant obtained payments for pet boarding expenses from State Farm through the false pretense of submitting a "fraudulent invoice," the evidence introduced at trial showed that (1) Defendant submitted a valid estimate of the expenses that would have been incurred had her four pets stayed at Meadowsweet for a full month; and (2) Defendant subsequently obtained payments from State Farm through
 
 oral
 
 misrepresentations that were made by her over the next six months to the effect that she was entitled to continue receiving such payments despite the fact that she had removed her pets from Meadowsweet on 22 October 2009.
 

 Our Supreme Court has explained that with regard to the offense of obtaining property by false pretenses, "[t]he state must prove, as an essential element of the crime, that defendant made the misrepresentation as alleged" and that "[i]f the state's evidence fails to establish that defendant made this misrepresentation but tends to show
 
 some other misrepresentation was made,
 
 then the state's proof varies fatally from the indictments."
 
 State v. Linker,
 

 309 N.C. 612
 
 , 615,
 
 308 S.E.2d 309
 
 , 311 (1983) (emphasis added).
 

 Indeed, we find the present case analogous to
 
 Linker.
 
 In
 
 Linker,
 
 the defendant was charged with two counts of obtaining property by false pretenses. The indictments alleged that the defendant, whose name was Barry
 
 L.
 
 Linker and who was not an accountholder at Wachovia Bank,
 
 *648
 
 had committed the false pretense of "represent[ing] himself as Barry
 
 W.
 
 Linker who did have a valid account and attempted to cash a check for $120.00" in order to obtain property from Wachovia.
 
 Id.
 
 at 613,
 
 308 S.E.2d at 310
 
 (emphasis added). The evidence at trial, however, showed that the defendant presented the bank tellers with a valid driver's license identifying himself as Barry L. Linker and when questioned about the differing middle initial between his driver's license and the information on the account stated that the initial on the account was incorrect.
 
 Id.
 
 at 614,
 
 308 S.E.2d at 310
 
 .
 

 The Supreme Court determined that the trial court erred in denying the defendant's motion to dismiss based on a fatal variance because the evidence at trial did not support the misrepresentation alleged in the indictment.
 
 Id.
 
 at 616,
 
 308 S.E.2d at 311
 
 . While the Supreme Court acknowledged that the evidence presented at trial would have supported a charge of obtaining property by false pretenses based on the defendant misrepresenting the fact that he had a Wachovia account when he did not actually possess one, that misrepresentation was not the misrepresentation alleged in the indictment.
 

 Id.
 

 at 615 n. 2,
 
 308 S.E.2d at
 
 311 n. 2.
 

 The indictments explicate the alleged misrepresentation in clear and unequivocal terms: Defendant "represented himself as Barry W. Linker." The record clearly reflects that the state failed to prove that defendant represented himself as Barry W. Linker. Without exception, each of the state's witnesses testified that defendant never represented himself as Barry W. Linker. Instead, he gave each bank employee his driver's license which established that he was, in fact, Barry L. Linker. Simply put, defendant never made the misrepresentation charged in both indictments.
 

 Id.
 
 at 615,
 
 308 S.E.2d at 311
 
 . The Supreme Court concluded that because the defendant "positively identified himself [as Barry L. Linker] with his driver's license to each bank
 
 *237
 
 official.... the state's proof varied fatally from the allegations in the indictment."
 
 Id.
 
 at 616,
 
 308 S.E.2d at 311
 
 .
 

 The same reasoning applies here. Unlike the evidence supporting the counts relating to the moving company charges, the evidence did not support a finding that the document Defendant submitted to State Farm with regard to pet boarding services at Meadowsweet was a "fraudulent invoice" as alleged in the indictment. While Defendant's repeated oral misrepresentations that allowed Defendant to improperly obtain payments from State Farm over the next six months-consisting of
 
 *649
 
 her false assurances that her pets remained boarded at Meadowsweet beyond 22 October 2009-
 
 could have
 
 given rise to the offense of obtaining property by false pretenses if contained within the indictment, the indictment as to this count did not allege them.
 

 In short, the document at issue was not a "fraudulent invoice" purporting to be from an entity that was actually fictitious (as was the case regarding the moving expenses) but rather a genuine estimate prepared by a legitimate business. It could not have been construed as an invoice for services previously rendered because it was generated the first day Defendant placed her pets with Meadowsweet. The initial payment of $2,040.00 was issued by State Farm before it ever received the written estimate. The remaining payments comprising the $11,395.00 figure listed in the indictment were induced by Defendant's false oral representations over the next six months that her pets continued to be boarded at Meadowsweet. Accordingly, there was a fatal variance between the allegations of the indictment and the evidence presented at trial to establish this count of obtaining property by false pretenses. For this reason, we must vacate Defendant's conviction on this count.
 
 See
 

 State v. Gayton-Barbosa,
 

 197 N.C.App. 129
 
 , 136-37,
 
 676 S.E.2d 586
 
 , 591 (2009) (vacating defendant's larceny conviction due to fatal variance between indictment and evidence presented at trial).
 
 [6]
 

 III. Admissibility of Evidence Concerning Defendant's Failure to Attend Scheduled Examinations
 

 Defendant next contends that the trial court erred in admitting testimony that she did not appear for two scheduled examinations under oath as required by her insurance policy and failed to respond to State Farm's request to reschedule the examination. Defendant acknowledges that she failed to object to the introduction of this evidence and that, consequently, this Court's review of the admission of this evidence is limited to plain error.
 

 In order to establish plain error, Defendant bears the burden of showing that a fundamental error occurred at trial.
 

 *650
 

 State v. Lawrence,
 

 365 N.C. 506
 
 , 518,
 
 723 S.E.2d 326
 
 , 334 (2012). "To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty."
 

 Id.
 

 (citation and quotation marks omitted).
 

 Defendant makes three arguments challenging the admissibility of this evidence. First, she asserts that this evidence was irrelevant and, therefore, inadmissible under Rules 401 and 402 of the North Carolina Rules of Evidence. Second, she contends that the evidence violated N.C. Gen.Stat. § 14-100(b). Third, she argues that the evidence should have been excluded pursuant to Rule 403 of the North Carolina Rules of Evidence. We address each of these issues in turn.
 

 A. Relevance
 

 Rule 401 defines relevant evidence as "evidence having any tendency to make
 
 *238
 
 the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.R. Evid. 401. Irrelevant evidence, conversely, is evidence "having no tendency to prove a fact at issue in the case."
 
 State v. Hart,
 

 105 N.C.App. 542
 
 , 548,
 
 414 S.E.2d 364
 
 , 368,
 
 appeal dismissed and disc. review denied,
 

 332 N.C. 348
 
 ,
 
 421 S.E.2d 157
 
 (1992). Rule 402 provides that relevant evidence is generally admissible at trial while irrelevant evidence is not admissible. N.C.R. Evid. 402.
 

 We do not agree with Defendant's assertion here that the evidence concerning her failure to appear for an examination under oath pursuant to the terms of her insurance policy with State Farm was not relevant. In order to establish the offense of obtaining property by false pretenses, the State was required to prove that Defendant's acts were done "knowingly and designedly ... with intent to cheat or defraud."
 
 State v. Hines,
 

 54 N.C.App. 529
 
 , 532-33,
 
 284 S.E.2d 164
 
 , 167 (1981) (quotation marks omitted);
 
 see also
 
 N.C. Gen.Stat. § 14-100 (2011). As this Court has previously observed, "a person's intent is seldom provable by direct evidence, and must usually be shown through circumstantial evidence."
 
 State v. Walston,
 

 140 N.C.App. 327
 
 , 332,
 
 536 S.E.2d 630
 
 , 633 (2000) (citation, quotation marks, and brackets omitted). "In determining the presence or absence of the element of intent, the jury may consider the acts and conduct of the defendant and general circumstances existing at the time of the alleged commission of the offense charged [.]"
 
 Id.
 
 at 332,
 
 536 S.E.2d at 634
 
 (citation, quotation marks, and brackets omitted).
 

 In the present case, Dawdy testified that Defendant's insurance claim was referred to him as a potential fraud case because of "indicators [of
 
 *651
 
 fraud] with respect to the unresolved pet boarding charges" and a supplemental claim for additional personal property losses totaling $59,000.00. When he received the case, Dawdy contacted Defendant, apprised her of his role with State Farm, and informed her that State Farm had questions concerning her submitted claims and would be invoking "a policy provision called an examination under oath," which he explained as "an opportunity for [the] policyholder to come in and under oath give testimony to us about the questions we have" concerning the claim at issue.
 

 Dawdy further testified that the examination was initially scheduled for 20 October 2010 but that Defendant did not appear for the examination on that date. Defendant was then sent a "second chance letter" requesting that she contact Cox, State Farm's attorney, within ten days to reschedule the examination. When she did not respond, Cox sent another letter on 16 November 2010 informing her that the examination had been rescheduled for 30 November 2010, but she did not show up for the examination on that date. Defendant's failure to appear for any of the scheduled examinations as well as the fact that she did not contact Dawdy or Cox to reschedule the examination constituted circumstantial evidence tending to show that her submission of requests for payments to which she was not entitled was done "knowingly and designedly ... with intent to cheat or defraud."
 
 N.C. Gen. Stat. § 14100
 
 (a). Because Defendant was informed that the purpose of the examination under oath was to enable State Farm to further investigate the legitimacy of her insurance claims, her failure to respond and to attend or reschedule the examination raised a reasonable inference as to her awareness that her claims were fraudulent. Accordingly, because this evidence was relevant to an essential element of an offense for which she was charged, its admission did not violate Rule 402.
 

 B. N.C. Gen.Stat. § 14-100(b)
 

 Defendant also contends that the trial court's admission of this evidence constituted plain error because it violated subsection (b) of N.C. Gen.Stat. § 14-100 (the statute codifying the crime of obtaining property by false pretenses), which states that "[e]vidence of nonfulfillment of a contract obligation standing alone shall not establish the essential element of intent to defraud." N.C. Gen.Stat. § 14-100(b). However, nothing in N.C. Gen.Stat. § 14-100(b) renders this type of evidence inadmissible. Rather, subsection (b) simply makes clear
 
 *239
 
 that such evidence-without more-is insufficient to satisfy the intent to defraud element of this offense. Thus, her argument that N.C. Gen.Stat. § 14-100(b) served as a bar to the
 
 admissibility
 
 of this evidence lacks merit.
 
 *652
 

 C. Rule 403
 

 Finally, Defendant contends that even if the evidence of her failure to appear for an examination under oath possessed some degree of relevance, it nevertheless should have been excluded under Rule 403 because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice to her. Pursuant to Rule 403, the trial court may, in its discretion, exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.R. Evid. 403.
 

 However, as we explained in
 
 State v. Cunningham,
 

 188 N.C.App. 832
 
 ,
 
 656 S.E.2d 697
 
 (2008), "[t]he balancing test of Rule 403 is reviewed by this court for abuse of discretion, and we do not apply plain error to issues which fall within the realm of the trial court's discretion."
 

 Id.
 

 at 837
 
 ,
 
 656 S.E.2d at 700
 
 (citation and quotation marks omitted). Therefore, Defendant's attempt to rely on Rule 403 as to this issue is misplaced.
 

 IV. Jury Instruction on Breach of Contract
 

 In a related argument, Defendant also contends that the trial court erred by failing to instruct the jury that pursuant to N.C. Gen.Stat. § 14-100(b), "[e]vidence of nonfulfillment of a contract obligation standing alone shall not establish the essential element of intent to defraud." Defendant did not request this instruction, and therefore, we review the trial court's failure to give this instruction solely for plain error.
 
 See
 

 Lawrence,
 

 365 N.C. at 517
 
 ,
 
 723 S.E.2d at 333
 
 (explaining that alleged instructional errors that are unpreserved only rise to the level of plain error where "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty" (citation and quotation marks omitted)).
 

 In
 
 Hines,
 
 we rejected a similar argument. The defendant in
 
 Hines
 
 had been charged with two counts of obtaining property by false pretenses arising out of allegations that he had obtained money from the victims by representing that he would arrange the incorporation of a proposed business venture between them and secure a site for the business at a local shopping mall.
 
 Hines,
 

 54 N.C.App. at 531-32
 
 ,
 
 284 S.E.2d at 166
 
 . Contrary to his representations, the defendant did not actually take steps to incorporate the business nor did he use the money he obtained from them as a rental deposit for a storefront.
 
 Id.
 
 at 532,
 
 284 S.E.2d at 166
 
 . On appeal, the defendant argued that the trial court erred by failing
 
 *653
 
 to expressly inform the jury that, based on N.C. Gen.Stat. § 14-100(b), the element of intent to defraud could not, without more, be established by the breach of a contractual obligation.
 
 Id.
 
 at 536,
 
 284 S.E.2d at 169
 
 . This Court disagreed, explaining that (1) the trial court "instructed on all essential elements of obtaining property by false pretense" and "all substantial features of the case"; and (2) "[t]he jury could not have been misled by the instructions given to find defendant guilty solely on the ground that he did not fulfill his contractual obligations."
 

 Id.
 

 (citation and quotation marks omitted). The same is true in the present case.
 

 Here, the trial court instructed the jury that it could only find Defendant guilty of each of the two counts of obtaining property by false pretenses concerning the moving company invoices if it found that (1) Defendant "made a representation by presenting a written statement to State Farm Fire and Casualty Company for services rendered" by (a) M & M Movers in the amount of $4,760.00, or (b) PJ's Moving Company in the amount of $10,430.00; (2) the representation was false; (3) the representation was calculated and intended to deceive; (4) State Farm was in fact deceived by it; and (5) Defendant obtained the property at issue from State Farm as a result of making the representation.
 

 *240
 
 Thus, the jury was expressly informed that it was required to determine that Defendant intended to defraud State Farm through her submission of documents containing false representations in order to return a guilty verdict. Therefore, no reasonable juror could have been left with the mistaken belief that she could be found guilty based solely on her failure to comply with contractual obligations under her insurance policy. For this reason, her argument on this issue is without merit.
 

 V. Alleged Failure of Indictments to Adequately Apprise Defendant of Charges
 

 In her final argument, Defendant argues that the indictments were fatally defective because they did not allege the "exact misrepresentation" she made with sufficient precision. We disagree.
 

 The failure of a criminal pleading to charge the essential elements of the stated offense is an error of law that is reviewed
 
 de novo.
 

 State v. Sturdivant,
 

 304 N.C. 293
 
 , 308,
 
 283 S.E.2d 719
 
 , 729 (1981). As discussed above, a primary purpose of an indictment "is to inform a party so that he may learn with reasonable certainty the nature of the crime of which he is accused...."
 
 State v. Brinson,
 

 337 N.C. 764
 
 , 768,
 
 448 S.E.2d 822
 
 , 824 (1994) (citation and quotation marks omitted). Thus, in order to be valid, "[a]n indictment ... charging a statutory offense must allege
 
 *654
 
 all of the essential elements of the offense."
 
 State v. Crabtree,
 

 286 N.C. 541
 
 , 544,
 
 212 S.E.2d 103
 
 , 105 (1975). Because the indictments concerning the moving company expenses did not specifically allege how, or in what manner, the invoices Defendant submitted were fraudulent, she argues that they were fatally defective.
 

 "The general rule in this State and elsewhere is that an indictment for a statutory offense is sufficient, if the offense is charged in the words of the statute, either literally or substantially, or in equivalent words."
 
 State v. Harris,
 

 219 N.C.App. 590
 
 , 592-93,
 
 724 S.E.2d 633
 
 , 636 (2012) (citation and quotation marks omitted). Furthermore, in alleging the essential elements of the charge, an indictment "need only allege the ultimate facts constituting each element of the criminal offense."
 
 Id.
 
 at 592,
 
 724 S.E.2d at 636
 
 (citation and quotation marks omitted). "Pursuant to N.C. Gen.Stat. § 14-100, our Supreme Court has defined the offense of [obtaining property by] false pretenses as (1) a false representation of a subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which one person obtains or attempts to obtain value from another."
 
 Walston,
 

 140 N.C.App. at 332
 
 ,
 
 536 S.E.2d at 633
 
 (citation and quotation marks omitted).
 

 We believe the indictments for the two counts relating to the moving expenses were legally sufficient. Each alleges both the essential elements of the offense and the ultimate facts constituting those elements by stating that Defendant obtained U.S. currency from State Farm through a false representation she made
 
 by submitting a fraudulent invoice
 
 which was intended to-and, in fact, did-deceive State Farm. Therefore, it was clear from the indictments that the false invoices she submitted purporting to be from PJ's Moving Company and M & M Movers formed the basis for these counts. Thus, Defendant's argument on this issue is overruled.
 

 Conclusion
 

 For the reasons stated above, we vacate Defendant's conviction on the count of obtaining property by false pretenses arising from the pet boarding expenses. We find no error as to Defendant's remaining convictions. Because the count we are vacating was consolidated for judgment with the two other counts of obtaining property by false pretenses, we remand for resentencing so that the trial court may enter a new judgment on the convictions being upheld.
 
 See
 

 State v. Williams,
 

 150 N.C.App. 497
 
 , 506,
 
 563 S.E.2d 616
 
 , 621 (2002) (remanding for resentencing after vacating one offense in consolidated judgment because
 
 *655
 
 whether remaining offense "warrants the sentence imposed in connection with the two consolidated crimes is a matter for the trial court to reconsider").
 
 [7]
 

 *241
 
 VACATED IN PART; NO ERROR IN PART.
 

 Judges ELMORE and TYSON concur.
 

 [1]
 

 It was later revealed that this was the home address of Mike Beasley, Defendant's father-in-law, and Mike Beasley, Jr., his son.
 

 [2]
 

 A receipt from Meadowsweet introduced at trial dated 22 October 2009 showed that Defendant's pets had, in fact, been checked out of Meadowsweet on 22 October and that a bill of $845.00 had been paid by check. The receipt did not state who provided the check.
 

 [3]
 

 During his investigation, Biggs was able to find a consignment store next to a storefront bearing the address 6010 Oleander Drive, but the consignment store's address was not visibly marked on the signage and the store was not open when he visited the location.
 

 [4]
 

 While Defendant challenges the trial court's admission of the evidence concerning her failure to appear for the examination under oath, this evidence was properly admitted by the trial court as discussed
 
 infra.
 

 [5]
 

 We observe that the prosecutor referred to this document as an "estimate" throughout the trial, at one point directing the court reporter to strike his own question to Rowley as to whether State Farm continued "to pay pet boarding based upon this
 
 invoice
 
 " and then rephrasing the question to ask if State Farm continued to pay pet boarding "based upon this
 
 estimate.
 
 " (Emphasis added.)
 

 [6]
 

 Defendant also asserts that the trial court either (1) deprived her of her constitutional right to a unanimous verdict; or, alternatively, (2) committed plain error, by instructing the jury that it could find her guilty of obtaining property by false pretenses if it found that Defendant had made
 
 either
 
 written
 
 or
 
 oral misrepresentations to State Farm concerning the pet boarding expenses at Meadowsweet. However, we need not address these contentions nor the remaining arguments in her brief as applied to the pet boarding count because we are vacating her conviction on this count due to the fatal variance discussed above.
 

 [7]
 

 We note, however, that it appears from the record that Defendant has already served the sentence of imprisonment imposed in the consolidated judgment.